LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Ave.
Hagåtña , Guam 96910
TEL: (671) 472-7332
FAX: (671) 472-7215/7334

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| BERNARD SIKIMOUR PHILLIP, ) | CIVIL CASE NO. 05-0039 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | **DECLARATION OF** |
| ) | **NANCY K. FINN** |
| UNITED STATES DEPARTMENT OF ) | |
| STATE, ) | |
| UNITED STATES IMMIGRATION AND ) | |
| CUSTOMS ENFORCEMENT and ) | |
| NANCY K. FINN, individually and in her ) | |
| official capacity, ) | |
| ) | |
| Defendants ) | |

I, Nancy K. Finn, declare and state as follows:

     1.    I am the Regional Director for the U.S. Department of State's Passport Agency in Honolulu, Hawaii, 300 Ala Moana Blvd., Suite 1-330, Honolulu, Hawaii. My responsibilities include the management of the Honolulu Passport Agency, which is responsible for approving and issuing U.S. passports to U.S. citizens and U.S. nationals. This is accomplished by a staff of approximately 26 employees, both government and contract, whose work I oversee.


EXHIBIT 2

2.  I began working for the Department of State as a Passport Specialist in November 1978. In 1983, while working in Passport Headquarters in Washington, D.C., I participated in interagency working groups addressing implementation of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant") and the Compact of Free Association.

3.  By 1985, I was working closely with Department of State and Department of Justice attorneys in crafting the procedures and guidelines to be used for the adjudication of U.S. citizenship claims under the Covenant. During my first trip to the CNMI in 1985, I met with several of the signatories of the Covenant and studied the legislative history relevant to section 301 of the Covenant. I became familiar with the types of documents available in all of the former Trust Territories and provided this information to Passport Services for incorporation into the initial adjudicative guidelines for documenting U.S. citizenship claims pursuant to Section 301 of the Covenant. This guidance was applied by passport specialists and consular officers worldwide beginning on Citizenship Day, November 4, 1986. I have been engaged with the modifications to the guidance brought about by the various NMI District Court decisions, beginning with *Shoda* and *Dela Cruz* in 1987 and 1988, respectively, through *Sabangan* in 2005. These guidelines are published in 7 FAM 1126.

4.  I have held my current position, as Regional Director of the Honolulu Passport Agency, since March 1, 1987. I make the following statements based upon my personal knowledge, on information provided to me in my official capacity, and on my evaluation of that information.

5.  I am familiar with the adjudication of the passport applications received from Bernard Phillip, plaintiff in the above-captioned case. From the time of Mr. Phillip's first application for a U.S. Passport in June 8, 1999, I have personally reviewed each and every substantive letter sent to Mr. Phillip regarding pending passport applications. In each case, I worked with a senior passport specialist and thoroughly reviewed each and every piece of documentation submitted with Mr. Phillip's pending and prior applications. After I was served with legal process in this case on November 30, 2005, I reviewed the Passport Agency's entire file on Mr. Phillip's prior passport applications, each of which involved numerous exchanges of correspondence.

6.  Mr. Phillip's application pursuant to section 301(b) of the Covenant was not unlike many others that we had seen before. Although these applications as a group have many similar characteristics, each application must be considered on its own merits. Many of the cases exhibit similar deficiencies, and, after following our suggestions on how to complete the documentation, many of the 301b applicants are successful. Although we do not keep statistics on this, I am generally aware of the relevant application and issuance rates and I believe that of the hundreds of applications from the Commonwealth of the Northern Mariana Islands ("Section 301b applicants") received since 1986, more than sixty percent have been approved.

7. The adjudication of Covenant Section 301(b) and Section 301(c) citizenship claims are among the most complex that any passport specialist will encounter. The Honolulu Passport Agency, under my direction, has developed significant expertise in dealing with these cases. Based on my experience and the prior experience of the Honolulu Passport Agency, I am well aware of the challenges faced by persons from the Federated States of Micronesia (FSM), the Republic of the Marshall Islands (RMI) and the Republic of Palau (Palau) due to the inconsistent and limited availability of public records to assist them in establishing both their date and place of birth as well as their domicile. In light of those limitations, the Passport Agency vets these applications very thoroughly. They are handled only by senior passport specialists whose judgment and analytical skills have been proven.

8. If a passport application from a persons originating from the FSM, the RMI or Palau is determined to be deficient, the senior Passport Specialist assigned prepares a custom letter, which I review, in an effort to guide the applicant to a successful conclusion – the issuance of the U.S. passport. This is quite different from the vast majority of deficient applications processed at the Passport Agency who generally receive only form letters requesting additional documentation to complete their applications. We customize such letters to persons originating from the FSM, the RMI and Palau because we are sensitive to the challenges that record searches bring to people from these locations. I personally have the final review on these letters. Our records show that Mr. Phillip received such custom letters after comprehensive reviews on July 2, 1999, Sept. 17, 1999, Oct. 31, 2000, March 2, 2001 and June 20, 2003.

9. In order to maintain the integrity of the U.S. passport and prevent fraud and abuse of the system, the date and place of birth are essential factors for identifying an individual, establishing citizenship and completing the passport. In all cases, the passport agency is required to obtain reliable information to establish these facts. This requires documentation from public records, unless an applicant duly establishes that such information is not available. Affidavits may be considered only after the applicant makes every attempt to obtain public records and certification is received indicating that no such records exist.

10. Mr. Phillip alleged that he was born in 1933 in Chuuk, but he failed to provide any contemporaneous or near contemporaneous public record of those facts. Instead, he provided only a Trust Territory of the Pacific Island Birth record, registered on 6/13/1979 – 46 years after his birth.

11. When Mr. Phillip related his lack of public records of this information, the Passport Agency asked Mr. Phillip what information was provided the registry for purposes of obtaining his birth certificate. Mr. Phillip was asked to produce a statement from the Clerk of Court of Chuuk on that matter. Mr. Phillip provided no responsive information relating to his own application. Rather than providing an explanation or making any effort specific to his own case, Mr. Phillip presented to the Passport Agency a letter sent by the Clerk's office to an unrelated individual.

12.   To assist Mr. Phillip with the first application filed in 1999, the Passport Agency advised Mr. Phillip to search for early public records at the Trust Territory Archives at the NMI Community College or the Hamilton Library at the University of Hawaii at Manoa.

13.   The Passport Office had reason to believe, based on past experience with passport applicants from FSM, that the archives may contain a copy of an identification card issued by the Naval Administration during the Trust Territory period. The Passport Office believes these ID cards were required of everyone resident on the island, because of the sensitive US installations there. They identify full name, date and place of birth, possibly parents' names, and a photograph of the subject.

14.   Absent a reasonable attempt to search these records, the Passport Agency could not conclude that early public records establishing plaintiff's date and place of birth were not available.

15.   In response to the Passport Agency's request that Mr. Phillip pursue these records at the indicated places, Mr. Phillip, through his attorney, responded that to "request further documentation from Mr. Phillip would be unduly burdensome..." in the January 30, 2001 letter from Tom Schweiger.

16.   The second major element needing additional documentation was Mr. Phillip's alleged domicile in the CNMI between November 1981 and November 1986. Documentation provided by Mr. Phillip included gaps that required explanation. For example, Social Security earnings records relied upon to evidence residency during the essential period reflect an earnings gap the last three quarters of 1985 and most of 1986. This might signal that Mr. Phillip was off the island, and therefore, constituted a genuine concern.

17.   In 1999, Plaintiff provided a voter registration record that showed he did not register to vote in the NMI prior to 1977. In past experience with FSM applicants, the Passport Office has seen the 1974 registration listed on the Board of Elections Certification. The absence of that year lead the Passport Office to question whether Mr. Phillip was actually physically present on Saipan during the 1974 voter registration period. Mr. Phillip subsequently provided a revised voter registration record, in May 2003, reflecting that he had registered to vote in 1974. Specifically, a CNMI Election Commission Certificate of Voter Registration dated January 23, 2003, indicating registration in 1974, 1977, 1979, 1981, 1983, 1985, 1985,1987, 1989, 1993, 1995, 1995, 1996, 1997, 1999, 2003. By comparison, the April 26, 1999 Board of Elections certification indicates voter's registration for only 1977, 1979, 1981, 1983, 1985, 1985, 1987, 1989, 1993, 1995, 1996 and 1997. Both documents were purportedly issued by the same Administrative Officer, Julita A. Villagomez. The conflict in documents constituted a genuine concern for the Passport Office.

18.   In light of challenges Mr. Phillip faced in obtaining a U.S. Passport, the Passport Agency recommended that he obtain an FSM passport, to facilitate his travel.

This recommendation was made in the Passport Agency's letter of Sept. 17, 1999 to assist Mr. Phillip. Those holding an FSM passport are free to travel to and from the United States under the Compact of Free Association. Obtaining an FSM passport does not in any way prejudice a U.S. citizen's ability to obtain a U.S. passport. See 7 FAM 081,082.

19. Mr. Phillip did not receive a U.S. passport prior to the filing of this litigation because of his refusal to attempt to comply with our requests for further documentation and clarification and our advice for obtaining that documentation.

20. It was only in the context of this suit that Mr. Phillip pursued the suggestions of the Passport Office and: obtained a letter from the Trust Territory Archives indicating that no records specific to Mr. Phillip could be found; provided a notarized affidavit explaining gaps in his claimed domicile in the CNMI; and made proper inquiry of the Chuuk Clerk of Court. The result was a certification from the Clerk that indicated that a midwife, "Ruth", and Mr. Phillip's brother had provided the basis of the delayed registration.

21. After considering these long requested items within the totality of Mr. Phillip's application, I approved the issuance of his U.S. passport pursuant to section 301(b) of the Covenant on March 23, 2006.

Pursuant to 28 U.S.C. Sec. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of June 2006 in Honolulu, Hawaii

_____
Nancy K. Finn
Regional Director
Honolulu Passport Agency

# 7 FAM 080
# DUAL NATIONALITY

*(CT:CON-106;  06-06-2005)*
*(Office of Origin:  CA/OCS/PRI)*

## 7 FAM 081  SUMMARY

*(CT:CON-106;  06-06-2005)*

a. Dual nationality is the simultaneous possession of two citizenships.

b. Dual nationality results from the fact that there is no uniform rule of international law relating to the acquisition of nationality.  Each country has its own laws on the subject and confers its nationality on individuals on the basis of its national policy and law.  For example, the laws of some countries provide for automatic acquisition of citizenship at birth or through marriage.  Some persons born in the United States may be surprised to learn that they also possess derivative nationality of another country through a grandparent.  Today, it is not uncommon for individuals to possess not just dual nationality, but multiple nationalities. While dual nationality can provide the individual with many benefits, such as the ability to work freely in the other country, it can also impose burdens, including military service, taxes, etc.

c. If you receive inquiries about dual nationality, you may refer the inquirer to our brochures on this subject, Dual Nationality and Advice About Possible Loss of U.S. Citizenship and Dual Nationality, which are available on the Department of State, Bureau of Consular Affairs Internet page.

d. International law recognizes that each country determines who is a national of that country.

e. **U.S. Policy on Dual Nationality**:  While recognizing the existence of dual nationality, the U.S. Government does not encourage it as a matter of policy because of the problems it may cause. Dual nationality may hamper efforts by the U.S. Government to provide diplomatic and consular protection to individuals overseas.  When a U.S. citizen is in the other country of their dual nationality, that country has a predominant claim on the person.  A foreign country might claim you as a citizen of that country if (a) you were born there; (b) your parent or parents (and sometimes grandparents) are or were citizens of that country or (c) you are a naturalized U.S. citizen but are still considered a citizen under that country's laws.  (The oath you take when you are naturalized as a U.S. citizen (8 CFR 337.1) doesn't mean the foreign country does not still

regard you as a citizen of that country.)  Public inquiries about the citizenship laws of other countries should be directed to the embassy or consulate of that country in the United States.  8 U.S.C. 1185(b) (Section 215(b) INA) and 22 CFR 53.1 require that U.S. citizens exit and enter the United States on a U.S. passport, with certain limited exceptions (22 CFR 53.2).

# 7 FAM 082  DUAL NATIONALITY AND U.S. LAW -- GENERALLY

*(CT:CON-106;   06-06-2005)*

Current U.S. nationality laws do not explicitly address dual nationality, but the U.S. Supreme Court has stated that dual nationality is a "status long recognized in the law" and that "a person may have and exercise rights of nationality in two countries and be subject to the responsibilities of both."  See Kawakita v. United States, 343 U.S. 717 (1952).

# 7 FAM 083  DUAL NATIONALITY AND U.S. LAW – ACQUISITION OF ANOTHER COUNTRY'S NATIONALITY

*(CT:CON-106;   06-06-2005)*

U.S. citizens who naturalize in a foreign country or take an oath of allegiance to a foreign country do not automatically lose their U.S. citizenship.  In adjudicating potentially expatriating acts pursuant to 8 U.S.C. 1481(a) (Section 349(a) INA), the Department has adopted an administrative presumption regarding certain acts and the intent to commit them.  U.S. citizens who naturalize in a foreign country or take a routine oath of allegiance need not submit evidence of intent to retain U.S. nationality.  Intent to retain U.S. citizenship will be presumed.  A person who affirmatively assets to a consular officer, after he or she has committed a potentially expatriating act, that it was his or her intent to relinquish U.S. citizenship will lose his or her U.S. citizenship.  See 22 CFR 50.40.  See 7 FAM 1200.

# 7 FAM 084  NATURALIZED U.S. CITIZENS

*(CT:CON-106;   06-06-2005)*

Some countries do not recognize naturalization in a foreign country as grounds for loss of nationality.  Consequently, a naturalized U.S. citizen may retain the nationality of his or her birth, even though that a person who has

applied to become a naturalized U.S. citizen is required to "take an oath to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state or sovereignty of whom or which the applicant was before a subject or citizen." 8 U.S.C. 1448 (Section 337 INA (Immigration and Nationality Act of 1952, as amended; see 8 CFR 337 for the oath text).

## 7 FAM 085  U.S. PASSPORTS AND VISAS AND DUAL NATIONALITY

*(CT:CON-106;  06-06-2005)*

a. Section 215(b) of the INA (8 U.S.C. 1185(b) and 22 CFR 53 require U.S. citizens to enter and depart the United States on U.S. passports, with limited exceptions.

b. Although a consular officer may not issue a visa to an individual who has been determined to be a U.S. citizen, if a nonimmigrant visa applicant has a possible claim to U.S. citizenship but is unable or unwilling to obtain documents to establish that status, as determined by the post's citizenship and passport officer, the visa officer may presume that the applicant is an "alien" pursuing a nonimmigrant visa application. If the presumed alien is found eligible to receive the visa for which application was made, the visa may be issued prior to the final determination of citizenship status.

c. If an immigrant visa applicant has a possible claim to U.S. citizenship, the post's citizenship and passport officer must resolve the citizenship issue before the visa officer may take final action on the visa application.

d. See 9 FAM 40.2 Notes, *9 FAM* 42.12 N4 (2)(b) and *9 FAM* 42.71 N5.

## 7 FAM 086  CONSULAR PROTECTION AND SERVICES AND DUAL NATIONALITY

*(CT:CON-106;  06-06-2005)*

a. The Vienna Convention on Consular Relations (VCCR), and most bilateral consular conventions and other consular agreements do not address the issue of dual nationality or how dual nationality affects the provision of consular services and protection to dual nationals. It is the Department's policy to intervene on behalf of all U.S. citizens and U.S. noncitizen nationals, and make representations on their behalf, regardless of dual national status. While you should attempt to provide consular protection and services in accordance with this policy to the fullest extent permitted by the host country, you should make it clear to dual nationals that your

   ability to assist them may be limited.

b. It is a generally recognized rule, often regarded as a rule of international law, that when a person who is a dual national is **residing** in either of the countries of nationality, the person owes paramount allegiance to that country, and that country has the right to assert its claim without interference from the other country.  Thus, in the absence of agreements to the contrary between the United States and the country of second nationality, if a dual national encounters difficulties in the country of the second nationality while residing there, the U.S. government's representations on that person's behalf may or may not be accepted.

> **DUAL NATIONALITY AND ARREST CASES**
>
> See 7 FAM 416.3; 7 FAM 416.3-1  Dual National Arrestees In The Non-U.S. Country Of Nationality

c. Dual nationals traveling abroad on a passport of their other country of nationality (or even on a U.S. passport in the absence of an express agreement between the United States and the other country) may find that the host country treats them as a national of only that country and does not recognize the United States as a country entitled to provide consular services.  Nonetheless, you should provide consular services to the fullest extent permitted by the host country.

d. When a U.S. citizen is a dual national, but is not a citizen of the host country, and the second country of nationality is providing protective services to the dual national, you should consult with the citizen and your foreign consular colleagues to ensure that appropriate protection is provided.  The host country might permit consular visits only by the representative of one country, often the nation on whose passport the citizen entered the foreign country.  You should continue to follow significant developments in the case and report them to the Department by cable using CASC tags.

e. The United States does have a limited number of bilateral consular agreements or arrangements that address certain questions of related to dual nationals and consular assistance.  These agreements generally provide that all nationals of the United States entering the other country on the basis of U.S. travel documents containing properly executed entry and exit visas will, during the period for which their status has been accorded, and in accordance with the visa's period of validity, be considered nationals of the United States by the appropriate authorities of the foreign country for the purpose of ensuring consular access and protection by the United States.  See the Bureau of Consular Affairs Internet bilateral consular conventions feature and the CA/OCS Intranet treaties feature.  Consult CA/OCS/PRI (ASKPRI@state.gov) for additional guidance regarding these bilateral agreements and arrangements.

> **For example:**
>
> U.S. – China Bilateral Consular Convention – The Exchange of Notes appearing at the end of the text of the Convention provide:
>
> "2.  The two governments agree to facilitate travel between their respective countries of persons who may have a claim simultaneously to the nationality of the United States of America and the People's Republic of China, **but this does not imply that the governments of the two countries recognize dual nationality**.  Exit formalities and documentation shall be dealt with in accordance with the laws of the country in which such person resides. Entry formalities and documentation shall be dealt with in accordance with the laws of the country of destination.
>
> "3.  All nationals of the sending State entering the receiving State on the basis of travel documents of the sending State containing properly executed entry and exit visas of the receiving State will, during the period for which their status has been accorded, and in accordance with the visa's period of validity, be considered nationals of the sending State by the appropriate authorities of the receiving State for the purpose of ensuring consular access and protection by the sending State as provided for in Article 35 of the Consular Convention between the United States of America and the People's Republic of China. If judicial or administrative proceedings prevent the above-mentioned persons from leaving the country within the visa's period of validity, they shall not lose the right of consular access and protection by the sending State. Such persons shall be permitted to leave the receiving State without the necessity of obtaining documentation from the receiving State other than the exit documentation normally required of departing aliens."

Some arrangements on this subject are less formal.  For example:

(1) A 1994 agreement between the United States and Vietnam provides for immediate notification of and reciprocal access within 96 hours to each other's detained citizens.  Bearers of U.S. passports who enter Vietnam with a Vietnamese visa, including those of Vietnamese origin, are regarded as U.S. citizens by the U.S. Government for purposes of notification and access.  Therefore, U.S. citizens are encouraged to carry photocopies of passport data and photo pages with them at all times so that, if questioned by Vietnamese officials, proof of U.S. citizenship is readily available.

(2) The U.S.- DPRK Interim Consular Agreement provides that North Korea will notify the Swedish Embassy within four days of an arrest or detention of an American citizen bearing a U.S. passport who enter the DPRK with a DPRK visa and will allow consular visits within two days after a request is made by the Swedish Embassy.