**GEORGE L. HASSELBACK, Esq. (F0325-NMI)**
**O'Connor Berman Dotts & Banes**
**Second Floor, Nauru Building**
**P.O. Box 501969**
**Saipan, MP 96950**
**Telephone No. (670) 234-5684**
**Facsimile No. (670) 234-5683**

*Attorneys for Plaintiff Bernard Sikimour Phillip*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE
# COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **BERNARD SIKIMOUR PHILLIP,** ) | **CIVIL CASE NO. 05-0039** |
| ) | |
| **Plaintiff,** ) | |
| ) | **REPLY TO DEFENDANTS'** |
| vs. ) | **OPPOSITION TO AMENDED** |
| ) | **PETITION FOR AWARD OF** |
| **UNITED STATES OF AMERICA,** ) | **ATTORNEY FEES** |
| **UNITED STATES DEPARTMENT OF** ) | |
| **STATE, UNITED STATES** ) | |
| **IMMIGRATION AND CUSTOMS** ) | **Judge: Alex Munson, Chief Judge** |
| **ENFORCEMENT and** ) | |
| **NANCY K. FINN, individually and in her** ) | |
| **official capacity,** ) | |
| ) | |
| **Defendants.** ) | |

## I. INTRODUCTION

Plaintiff, by and through counsel, and pursuant to 28 U.S.C. § 2412, hereby files with this Court his Reply to Defendants' Opposition to Plaintiff's Amended Petition for Award of Attorney's Fees. In opposing Plaintiff's Petition, Defendants contend that Plaintiff is not a "prevailing party" for the purposes of the Equal Access to Justice Act ("EAJA"), that the Defendants' position was "substantially justified" and that the attorney fees that Plaintiff seeks are not "reasonable." In this Reply, Plaintiff will demonstrate that these contentions rely upon a fundamental misunderstanding of controlling precedent, a self-serving mischaracterization of

1

the actions of the Defendants, and a purposeful misconception of the attorney fees that Plaintiff was forced to incur.

This Reply is supported by Plaintiff's Amended Petition and its various attachments, the Amended Declaration of George L. Hasselback ("Amended Hasselback Decl.") filed previously with this Court, and the declaration of Jane Mack filed separately with this Court.

Additionally, in a continuing effort to settle this matter without any further involvement of the Court, counsel for Mr. Phillip re-iterates its offer to forgo collection of certain attorney fees incurred.  *See* Amended Hasselback Decl.  Plaintiff again represents that will accept the reduced amount of attorney fees of $10,376.43 for a full and final settlement of this issue. Plaintiff, however, will not further reduce his demand as Defendants have never raised their initial settlement offer.  As stated previously, if the various defendants insist upon litigating this question, Mr. Phillip demands a full payment of his attorney fees (amounting to $12,278.90).

## II. ANALYSIS

Defendants oppose the award of attorney fees to Mr. Phillip under the EAJA for three reasons.  First, they contend that Mr. Phillip is not a "prevailing party."  Second, they claim that their position was "substantially justified," and, therefore, they should be excused from paying.  Finally, Defendants claim that the fees that Mr. Phillip incurred were not "reasonable." Once applicable precedent and a fair legal standard is applied to these arguments, it becomes apparent that Mr. Phillip is indeed a "prevailing party," who overcame obstacles in the form of

legal positions that were not "substantially justified," and that the attorney fees he seeks are "reasonable" under the circumstances.

### A. *Mr. Phillip Is The Prevailing Party Here (And A Prevailing Party Under The EAJA).*

Mr. Phillip is not only the prevailing party in this particular lawsuit; he is a prevailing party under the current EAJA jurisprudence, because the Defendants now recognize that he is a United States citizen and, therefore, entitled to a U.S. passport, and this recognition has been incorporated into an Order by this Court which it maintains the jurisdiction to enforce. While Defendants present this Court with the decision rendered by the Ninth Circuit in *Carbonell v. Immigration and Naturalization Service* 429 F.3d 894 (2005), to establish that an applicant for attorney fees under the EAJA must meet a two-part test, they stop there. As Mr. Phillip will demonstrate, the Defendants have missed the forest for the trees in the *Carbonell* case. While it does stand for the proposition that an applicant must satisfy this test, it also explains why Mr. Phillip is the poster-child for satisfying it.

### 1. *Mr. Phillip And The Defendants' Relationship Has Materially Changed.*

Mr. Phillip is now recognized as a United States citizen by all of the various Defendants. Prior to the disposition of this lawsuit he was not. It is difficult to imagine a more material change in the relationship between Mr. Phillip and the Defendants. When it answered Mr. Phillip's Complaint on behalf of its employees and various agencies (the other Defendants), the United States admitted that "the [State] Department does not believe that he [Mr. Phillip] is a United States Citizen." *See* Answer of the United States at paragraph 18. When this lawsuit was finally resolved, the Defendants:

> stipulate[ed] that ***Plaintiff became a citizen of the United States on November 4, 1986***, under Section 301(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (emphasis added).

*See* Stipulation and Dismissal filed separately with this Court. Prior to the disposition of this case, the Defendants did not believe that Mr. Phillip was entitled to any of the rights and protections appertaining to United States citizenship. Now, they have agreed that Mr. Phillip is a United States citizen, and that he is entitled to all of the rights and privileges appertaining thereto. As Defendants have recognized in a number of their pleadings (to include the Opposition to this petition), there are few statuses that a person can aspire to that come with more benefits than United States citizenship. Mr. Phillip is now entitled to them all. Where once he was "one of them" with relation to the United States, he is now "one of us."

That this alteration in relationship was arrived at by agreement by the parties does not in any way diminish the gravity of this change in relation. The change in legal relationship between parties can be reached by consensus of the adverse parties and not affect one's qualification for attorney fees under the EAJA. According to the Ninth Circuit, "the vast majority" of federal Circuit Courts (including the Ninth Circuit) that have examined this issue have found that "a litigant can (prevail) for the purposes of awarding attorney's fees as a result of judicial action other than a judgment on the merits or a consent decree (provided that such action has sufficient "judicial imprimatur")." *Carbonell v. Immigration and Naturalization Service,* 429 F.3d 894, 899 (2005). In *Carbonell,* the applicant for fees materially altered his relationship with the INS "as a result of the parties' stipulation to a stay of departure." *Id.* The applicant in *Carbonell* simply acquired a stipulation to stay a deportation order, and this was

good enough for the Ninth Circuit to declare that he had "materially altered" his legal relationship with the INS. Here, Mr. Phillip has acquired a stipulation that *he is a citizen of the United States*. Certainly this is enough to say that he has "materially altered" his legal relationship with the Defendants.

Defendants' argument against a "material alteration" in their relationship with Mr. Phillip constitutes the bulk of their Opposition. There, Defendants continue to ignore the specific holding of *Carbonell* that addresses this issue, and instead, after talismanically presenting *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Resources,* 532 U.S. 598 (2001), to establish the "substantial alteration" prong of this test (something that Mr. Phillip does not contest exists), launch directly into a narrative that explains how the Defendants have not had to "compromise [their] requirements."[1] Defendants' Opposition at 2-4. This misses the point entirely. *Mr. Phillip sued to gain recognition as a U.S. citizen, not to change any policy or standard.*

Mr. Phillip was not required to force the Defendants to change their legislatively mandated requirements in order to have gained a "material alteration" in his legal relationship with Defendants. If this were the case, applicants for attorney fees under the EAJA, like Mr. Phillip, who did not reach a final judgment on the merits of the case would have to show an affirmative change in an administrative agency's policy. When, as here, that policy is

---

[1] When stripped of its rhetoric regarding the defense of America's borders from Mr. Phillip and the dire warning of potential "derivative claims" on his passport from his adult children and wife (who all already have U.S. passports), Defendants entire argument against a "material alteration" rests upon their assertion that they did not have to alter their standards of scrutiny. *Mr. Phillip did not file his lawsuit to change the policies, procedures and/or standards of the Defendants. He filed this lawsuit to gain recognition as a United States citizen.*

5

mandated by legislative acts, such an applicant would have to show that he or she effectuated *an act of Congress!* Such a proposition is absurd and grossly inflates the burden necessary to demonstrate one has effectuated a "material alteration" in one's relationship in order to qualify for attorney fees under the EAJA. *See Carbonell v. Immigration and Naturalization Service* 429 F.3d 894, 899 (2005) (where it was not necessary to show any change in agency procedure, standards or even practice to demonstrate the requisite "material alteration" in relationship).

Mr. Phillip has altered his relationship with the United States in the most material way conceivable. He has effectuated a recognition that he is a U.S. citizen.

*2.      This Court's Order Stamps This Change With Sufficient Judicial Imprimatur.*

Next, true to the pattern established thus far in their Opposition, Defendants contend that the change in relationship between them and Mr. Phillip has not been "judicially sanctioned" under the *Buckhannon* decision, because this Court has not ordered that they "reduce the requirements for documentation from passport applicants." Defendants' Opposition at 5. Once again, Defendants string-cite to the *Carbonell* decision, but either remain ignorant as to its holding or ignore it because of its negative impact upon their position.

An applicant for attorney fees under the EAJA is not required to achieve a court order that tells the adverse party what to do in order to meet the "judicial imprimatur" prong of the *Buckhannon* test. *Carbonell v. Immigration and Naturalization Service* 429 F.3d 894, 901 (9th Cir. 2005). In fact, "settlements which are incorporated into court orders . . . stamps [that]

6

agreement . . . with judicial imprimatur (internal citations and quotations omitted)." *Id.* Put even more clearly:

> [w]hen a court incorporates the terms of a voluntary settlement into an order "it may thereafter enforce the terms of the parties' agreement. Its authority to do so clearly establishes a 'judicially sanctioned change in the legal relationship of the parties,' as required by *Buckhannon,* because the plaintiff thereafter may return to the court to have the settlement enforced."

*Id,* quoting *Am. Disability Ass'n, Inc. v. Chmielarz,* 289 F.3d 1315, 1320 (11th Cir. 2002). Therefore, the Ninth Circuit in *Carbonell* held that "***the district court's order incorporating the voluntary stipulation to a stay of departure clearly meets the "judicial sanction" prong of the prevailing party test***." *Id.* Here, Mr. Phillip was not required to get this Court to Order Defendants to change any of their policies, practices and/or procedures, and he did not do so. However, he did effectuate a stipulation with the Defendants that this Court incorporated into its May 5, 2006, Order. Furthermore, this Court "retains jurisdiction in this case to enforce the terms and conditions of the stipulated agreement reached between the parties." This Court's May 5, 2006, Order. The incorporation of the agreement between the parties into this Court's Order and the retention of jurisdiction by this Court to enforce the terms thereof was not accidental. In so Ordering, this Court has stamped the settlement reached between the parties with "the requisite "judicial imprimatur"" to meet the second prong of the *Buckhannon* test.

Mr. Phillip is the "prevailing party."

***B.    The Defendant's Position Was Not Substantially Justified.***

An award of attorney fees under the EAJA is presumptive, and Defendants bear the burden to demonstrate why their position was "substantially justified" in both law and fact. *See*

7

*Bullfrog Films, Inc. v. Wick*, 959 F.2d 782, 784 (9th Cir.1992). In Opposing this Petition, Defendants provide a blanket definition of "substantially justified" gleaned from *Pierce v. Underwood,* 487 U.S. 552, 553 (1988), point to the Declaration of Nancy K. Finn ("Ms. Finn") attached to their Opposition, provide a brief summary thereof and conclusorily state that their position was "substantially justified." Defendants' Opposition at 5. While succinct, this analysis, such that it is, is bereft of any interpretive authority, and relies upon simply skimming Ms. Finn's declaration, taking it all at face value and ignoring what would "satisfy a reasonable person" (Opposition quoting *Pierce*) and the legal definition of "domicile."

It is important to remember that Defendants contend that their denial of Mr. Phillip's status as a United States citizen (and thereby his right to a U.S. passport) had two bases. One, the Defendants demanded "secondary birth information." Two, Defendants wanted information to substantiate perceived "gaps" in Mr. Phillips domicile within the CNMI. These demands, when taken in context with what the specific individuals involved in Mr. Phillip's passport application knew, illustrate that the Defendants' position in denying Mr. Phillip's citizenship was not "substantially justified."

*1.    "Experts" Who Ignore Their Own Knowledge Are Not Substantially Justified.*

Defendants have consistently touted the experience and knowledge of the individuals who reviewed and repeatedly denied Mr. Phillip's passport applications on the basis that he had not sufficiently proved that he was a United States citizen. In fact, the sole support for Defendants' argument that their position was substantially justified (the Declaration of Ms. Finn) spends a paragraph discussing this very level expertise. There, Ms. Finn testifies that:

8

> [t]he adjudication of Covenant Section 301(b) and Section 201(c) citizenship claims are among the most complex that any passport specialist will encounter. The Honolulu Passport Agency, under my direction, has developed significant expertise in dealing with these cases. Based on my experience and the prior experience of the Honolulu Passport Agency, I am well aware of the challenges faced by persons from the Federated States of Micronesia (FSM), the Republic of Marshall Islands (RMI) and the Republic of Palau (Palau) due to the inconsistent and limited availability of public records to assist them in establishing both their date and place of birth as well as their domicile. In light of those limitations, the Passport Agency vets these applications very thoroughly. They are handled by senior passport specialists whose judgments and analytical skills have been proven.

Clearly then, the expertise and experience of these individuals is the very reason that they were given Mr. Phillip's passport application to process. Why, then, should they be allowed to ignore everything that they know regarding the status of birth records in Chuuk when processing Mr. Phillip's applications?

The procedures used by Defendants to justify their demands for secondary birth evidence were based upon regulations for the verification of birth certificates issued in the United States. *See* Declaration of Jane Mack attached to Mr. Phillip's petition. Furthermore, there are no regulations or statutes that require additional birth records for persons born outside the United States beyond a certified copy of their birth certificate. *Id.* If Defendants did not know this at the time they began to process Mr. Phillip's applications (as they should have), they certainly were informed by Mr. Phillip's former counsel. *Id.* Defendants, apparently, felt that they were justified in requiring additional proof of Mr. Phillip's place of birth despite having in their possession ***a copy of his birth record certified by the Clerk of Courts of***

9

*Chuuk.*[2]  The "requirement" for "additional secondary birth evidence" was not a requirement at all, but rather something that the individuals working on Mr. Phillip's passport application desired, absent any statutory or regulatory justification.

Furthermore, as Mr. Phillip has repeatedly brought to this Court's attention, this was not the first time the "experts" at the Passport Agency had encountered the special problem with birth records relating to births in Japanese-occupied Chuuk.  The same individuals denied passports of previous applicants based upon the same lack of secondary birth information. *See* Mr. Phillip's Amended Petition.  Defendants knew there would be nothing else.  Defendants were told by Mr. Phillip's counsel, both past and present, that the Clerk of Courts of Chuuk had nothing other than the birth certificate already presented to them.  Despite this actual knowledge, Plaintiff was still forced to "prove a negative" and demonstrate that nothing else existed.  It is illustrative that it was only when this Court became involved directly and contacted the Clerk of Courts of Chuuk directly that Defendants were satisfied.

Finally, perhaps the most graphic illustration that this continued demand for non-existent documents was not "substantially justified" is the admission by Ms. Finn that ***the documents that he initially provided demonstrated when and where he was born.***  *See* Ms. Finn's letter to Mr. Phillip attached hereto as "Exhibit B" where she states that:

> "[t]he current, as well as your previous three U.S. passport applications and all accompanying documents . . . ***show that you were born in Chuuk, Federated States of Micronesia on May 31, 1933*** (emphasis added)."

---

[2]  In fact, this Court expressed puzzlement at why the Defendants had not treated a self-authenticating document of this nature as presumptively standing for exactly what it said absent some showing of unreliability.

If these documents show that he was born in Chuuk, FSM on May 31, 1933, then what else should Mr. Phillip have been forced to show? The only just answer should have been: nothing.

### 2.    An "Expert" In Passport Applications Should Know What "Domicile" Means.

Additionally, were Ms. Finn and her staff so eminently qualified to make determinations as to citizenship under the Covenant, perhaps they should have been informed as to the legal definition of the word "domicile." As presented in Mr. Phillip's Motion For Summary Judgment in this matter:

> *[p]eople enjoy a presumption of continued domicile*. The general proposition that "a domicile once acquired is presumed to continue until it is shown to have been changed" has remained a foundational concept of American jurisprudence for well over one hundred years. *Mitchell v. U.S.,* 88 U.S. 350, 353 (1874). *See also Lange v. Penn Mut. Life Ins. Co.* 843 F.2d 1175, 1179 (9th Cir. 1988) (where the same presumption of continued domicile was recognized in determining diversity of citizenship) and *Castillo-Felix v. Immigration & Naturalization Service* 601 F.2d 459, 464 (9th Cir. 1979) (recognizing the presumption of continued domicile in the context of aliens establishing domicile within the United States for purposes of immigration). Given this presumption, all Mr. Phillip must show is that he established a domicile in the CNMI prior to 1981, in order to satisfy the second requirement of section 301(b). At that point, the burden will shift to whomever asserts a change in domicile to show that Mr. Phillip has established a domicile elsewhere. He has not.
>
> To establish a domicile, an individual must both move to the new physical location and manifest an intention to remain there. *Id.* Here, there exists overwhelming evidence that Mr. Phillip not only physically resided within the Commonwealth of the Northern Mariana Islands, but that he intended to establish his domicile here prior to 1981. Mr. Phillip resided within the CNMI prior to 1981 where he lived, worked and raised his family. Mr. Phillip was employed in the CNMI prior to 1981 and contributed to CNMI social security during that time. Mr. Phillip repeatedly took part in municipal elections prior to 1981. Mr. Phillip certainly established a domicile within the CNMI prior to 1981 and it is presumed to continue until he establishes a new one in another location. Absent a showing that he has established another domicile, Mr. Phillip's domicile is presumed to remain within the CNMI from the date it was established. As it was established far before 1981 (and no proof could exist that he has established a domicile elsewhere because he simply has not done so), he meets the second of Section 301(b)'s requirements (emphasis added and some internal citations omitted).

11

As much as Defendants would like to rely upon Ms. Finn's flawed analysis that proof of domicile requires proof of constant residence within a jurisdiction, it is not so. Domicile and residence are discreet legal concepts. The dip in social security earnings that was of such concern to Ms. Finn paled in comparison to the multiple documents that illustrated that Mr. Phillip had established his domicile within the CNMI well before § 301(b)'s activation date and therefore, to assert that he was ever (or is now) domiciled elsewhere would have required an affirmative showing on the part of the Defendants. No showing was ever made, and Mr. Phillip's domicile was presumed to continue through until today.

Mr. Phillip was domiciled within the CNMI for the requisite period and had the Defendants appreciated the legal definition of "domicile" they would have recognized that.

### C.     Mr. Phillip's Fees Are Reasonable.

Defendants again leap to an immediate conclusion regarding the reasonableness of the requested fees without making any attempt to apply precedent that illustrates what is and is not reasonable within this context. Instead of simply taking Defendants' word for it, Mr. Phillip would rather this Court apply the guidance that it has used in the past to award attorneys fees.[3] The reasonableness of an award of attorney fees under the EAJA (like that under other fee-shifting provisions) is determined in the following fashion:

> [f]irst, the district court must calculate the lodestar amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. Next, in rare instances, the court may increase or reduce the presumptively

---

[3]   For instance Steven Parks v. Edward Camacho, Dept. Public Safety, Elias Sarjalou and Does 1-10 Civil Case No. 04-0013

12

> reasonable lodestar fee on the basis of factors enunciated by *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), which have not been subsumed in the lodestar.

*U.S. v. $12,248 U.S. Currency,* 957 F.2d 1513, 1520 (9th Cir.1991) (internal citations omitted). Here, Defendants have not disputed that the hourly rate quoted by Mr. Phillip's counsel is reasonable, and therefore, no further argument on that issue will be presented here.

Defendants do, however, dispute that the number of hours expended by Mr. Phillip's counsel were reasonable. They do so by characterizing a portion of the time billed by Mr. Phillip's attorneys as "social services." Opposition at 5. Defendants do not offer a definition of "social services," nor do they distinguish what they call "social services" from what they consider to be the actual "legal" work done by Mr. Phillip's attorneys. Instead, they vaguely call unidentified portions of Mr. Phillip's billing "inappropriate" under the EAJA without any explanation as to why. Yes, Mr. Phillip was referred from Micronesian Legal Services. However, this has nothing to do with what was necessary in representing Mr. Phillip once Mr. Hasselback became his attorney. That he was an indigent client does not somehow transform the legal advice and work done by his attorneys into "social services" that are inappropriate under the EAJA.

Defendants take issue with what they characterize as Mr. Phillip's counsel effectuating "assistance with travel." Opposition at 5. In arranging to get Mr. Phillip to the Man'amko meeting on Guam, his counsel certainly was not acting as a travel agent and was not simply purchasing his airline tickets so that he could go on vacation. Instead, counsel was forced to decide on two approaches to getting Mr. Phillip to Guam for this specific trip. In fact, this

13

Court will notice that the billings for the majority of the work related to this negotiation as to Mr. Phillip's status for the purposes of this trip took place before the Complaint was filed. Additionally, the attorney for the Defendants, Mikel Schwab, spent quite a bit of time on the phone with Mr. Hasselback discussing various options to effectuate this end without involving the Court. To now call this "social services" and not legal advice and work is as insulting as it is inaccurate. ***These charges were directly related to the central purpose of this case; to allow a United States citizen his freedom to travel between U.S. territories unhindered.*** Simply because this was effectuated through a negotiated agreement and not won thorough litigation should not preclude an award of fees for these services.

Furthermore, it is unclear what help Mr. Phillip's attorneys rendered with his "health issues" as Defendants allege. The only billing that could possibly be related to Mr. Phillip's health is that when Mr. Hasselback called him at the Commonwealth Health Center. This was not undertaken to hold Mr. Phillip's hand or as a "social service" as Defendants so contend, but rather he was called there because that is where he currently was! The services rendered to Mr. Phillip, and reflected in his billing records, were all undertaken in direct relation to his underlying legal claims and were not rendered as mere gratuitous "social services" as Defendants would have this Court believe. Counsel for Mr. Phillip is frankly perplexed at having the research, analysis and legal drafting that they have undertaken reduced to the status of work performed by a nursemaid.

It should be noted that even if all of the charges to which Defendants object are removed from Mr. Phillip's billing records, the attorney fees expended in this matter still

14

exceed ten-thousand dollars $10,000.00.[4]  Without any further specific criticisms of the reasonableness of the time spent on this case, Mr. Phillip will forgo further argument and rest upon the representations contained within his Amended Petition.

Finally, Defendants ask that this Court deny Mr. Phillip's application for fees as it would be "unjust" to do so. Opposition at 6. This is accompanied by an analysis of the Declarations of Jane Mack and George Hasselback to construct a scenario in which Mr. Phillip was given shoddy legal advice, and that to award him fees would encourage others to take shortcuts with regard to applications for U.S. passports. Disregarding the criticism of the legal advice that resulted in Mr. Phillip's position being vindicated after over nine years of delay, the notion that awarding an indigent person attorney fees for successfully gaining his rights and privileges as a United States citizen would be "unjust" strains credulity.  Defendants insinuate that this entire case was unnecessary, however they do not come out and say so, nor do they demonstrate that Mr. Phillip would be in any different situation had it not been for this lawsuit and the efforts of his counsel.

Mr. Phillip's counsel agreed to take a case with that would necessitate a great deal of work for a client that they knew had no means by which to pay them simply because it was an important issue and it was the right thing to do.  To deny an award of attorney fees in this

---

[4] Furthermore, as explained above, Mr. Phillip has offered to remove these items from his billing records and accept a lessened amount of attorney fees.  However, this offer has been met with no counter-offer and Defendants still contend that nine hundred dollars ($900.00) is sufficient recompense for nearly one hundred hours of work by highly trained and qualified attorneys.  Perhaps nine dollars ($9.00) an hour is sufficient compensation in some vocations, but it is difficult to imagine an attorney billing for that amount.  It also bears mentioning that ***Mr. Phillip is not seeking any attorney fees for the significant amount of time his attorneys have spent litigating the question of attorney fees.***

15

instant would be incredibly "unjust" as it would certainly discourage any of these attorneys, or others within the local legal community, from taking such cases and would allow the Defendants to continue to apply incorrect interpretations of the law to other individuals like Mr. Philip.

THEREFORE, pursuant to 28 U.S.C.A. § 2412, Plaintiff requests that this Court award him the costs of bringing the above-captioned suit and the attorney fees he incurred in its prosecution in the amount of $12,278.90.

Dated this 30th day of June, 2006.

>Respectfully submitted,
>
>O'CONNOR BERMAN DOTTS & BANES
>Attorney for Plaintiff Bernard S. Phillip
>
>By: _____/s/_____
>     GEORGE L. HASSELBACK (F0325)

K:\3000\3241-01 Bernard Phillip\Pleadings\OppAmendPettn Fee-060630-jom.doc